# United States Court of Federal Claims

No. 13-90 L

February 6, 2015

---

**RAMONA TWO SHIELDS and
MARY LOUISE DEFENDER
WILSON,** *etc.,*

                      *Plaintiffs,*

**v.**

**UNITED STATES OF AMERICA,**

                      *Defendant.*

Subject Matter Jurisdiction; *Cobell v. Norton*; Class Action Suit; Fiduciary Duty; Indian Tucker Act

---

    *Kenneth E. McNeil*, Shawn L. Raymond, and Charles R. Eskridge III, Susman Godfrey LLP, Houston, TX, for plaintiffs.

    *Stephen R. Terrell*, Environmental & Natural Resources Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION *and* ORDER

**Block,** *Judge.*

    This case is one of the myriad of breach of trust claims brought by Native Americans against various federal agencies.[1]  Paradoxically, the parties present very little in common.  Like the proverbial two ships passing in the night,[2] plaintiffs and defendant here present the court with two competing narratives that raise entirely different legal issues.

    Plaintiffs[3] Ramona Two Shields and Mary Louise Defender Wilson claim that the Bureau of Indian Affairs ("BIA") breached its fiduciary duty to prudently manage their mineral rights, which are held in trust by the United States.  Plaintiffs include a detailed narration of the depredations experienced by their tribes, and characterize the BIA's alleged breach as "the latest

---

[1] Between 2000 and 2015, the Court of Federal Claims issued opinions on at least 265 Indian trust cases.

[2] *See* Longfellow, *The Theologian's Tale*, in H. Longfellow, Tale Of A Wayside Inn 224 (Riverside Press ed. 1913).

[3] Plaintiffs file this law suit on behalf of themselves and the putative "*Two Shields* class."

chapter of United States mismanagement or outright abuse regarding the members of the Three Affiliated Tribes." Compl. ¶ 24.  Plaintiffs seek damages on behalf of themselves and their purported class.

Defendant presents an entirely different story.  Defendant does not dispute plaintiffs' characterization of the BIA's actions; in fact, defendant barely mentions them at all.  Rather, defendant argues that the BIA's alleged misdeeds are immaterial because plaintiffs' claims have already been litigated and settled.  Specifically, defendant argues that plaintiffs' claims were subsumed by the *Cobell* class action suit[4] against the United States Department of the Interior ("DOI"), and that plaintiffs' claims have already been settled pursuant to the $3.4 billion settlement ("Settlement Agreement") that brought the *Cobell* suit to a close in 2011, after more than a decade of litigation.[5]  According to defendant, plaintiffs forfeited any right to pursue their claims by failing to opt out of the class action Settlement Agreement.  Plaintiffs, in contrast, hardly mention *Cobell* at all in their complaint, and argue in their opposition brief that their claims are entirely unrelated to the *Cobell* litigation.  It is the role of the court to determine which of these two narratives prevails.

This litigation has given rise to a myriad of claims and motions.  Before the court are defendant's motion for summary judgment as to plaintiffs' breach of fiduciary claim (Count I), defendant's motion to dismiss for lack of subject matter jurisdiction plaintiffs' alternate breach of fiduciary duty claim (Count II), and defendant's motion to dismiss for failure to state a claim plaintiffs' legislative takings claim (Count III). Also before the court are plaintiffs' motion for discovery, defendant's motion for judicial notice and plaintiffs' motion for a sur-reply concerning defendant's motion for judicial notice.

For the following reasons, as fully explained below, the court shall grant defendant's motion for summary judgment regarding Count I, as well as defendant's motion to dismiss Counts II and III.  Furthermore, the court will deny plaintiffs' motion for discovery, yet will grant their motion for sur-reply.  Finally, defendant's motion for judicial notice will be granted-in-part.

## I. BACKGROUND

### A. The Instant Action

Plaintiff Ramona Two Shields is a member of the Three Affiliated Tribes in North Dakota. Compl. ¶ 16. Plaintiff Mary Louise Defender Wilson is a member of the Standing Rock Sioux Tribe. Compl. ¶ 17.   Plaintiffs both own allotments that are situated in the Fort Berthold Indian Reservation, which has been a "sweet spot" for development of the Bakken shale oil

---

[4] *See Cobell v. Babbitt*, 30 F. Supp. 2d 24, 28 (D.D.C. 1998).

[5] *Cobell v. Salazar*, No. 1:96CV01285 TFH, 2011 WL 10676927, (D.D.C. July 27, 2011) *aff'd*, 679 F.3d 909 (D.C. Cir. 2012) (finding that the Settlement terms were fair, reasonable, and adequate to absent class members).

formation.  Compl. ¶¶ 2, 5, 7-10.  According to recent estimates, the Bakken formation has over 7 billion barrels of recoverable oil.[6]

As intimated above, this suit concerns the BIA's alleged mismanagement of allotments belonging to plaintiffs.  An allotment is a specific parcel of land belonging to a Native American that was originally part of a common holding, such as a reservation.[7]  The creation of such allotments dates back to the General Allotment Act of 1887, 24 Stat. 388 (also known as the "Dawes Act"), which sought to encourage assimilation of Native Americans by dividing communal lands located in Indian reservations into individual parcels, or allotments.  See 24 Stat. 388 (repealed by Pub. L. 106-462, 114 Stat. 2007 (2000)).  The Act provided that Indian lands would be held in trust by the federal government for twenty-five years before being "patented"—at that point, the allotments would become freely alienable and subject to taxation.  *Id.*; See Judith V. Royster, *The Legacy of Allotment*, 27 ARIZ. ST. L.J. 1, 8-12 (1995).

In 1934, Congress abandoned this project of assimilation by passing the Indian Reorganization Act, Pub. L. No. 73-383, 48 Stat. 984, which prohibited any further division of Indian lands into allotments.  Land that had been already allotted prior to 1934 and that was still patent-free would be indefinitely held in trust and managed by the federal government. Following the 1934 Act, "individual Indians became beneficiaries of the trust lands, but lost the right to sell, lease, or burden the property without the federal government's approval."  *Cobell v. Norton*, 240 F.3d 1081, 1088 (D.C. Cir. 2001).  As a result of the creation of these allotments and the indefinite extension of the trust relationship, the United States is the trustee of approximately 11 million acres of individual allotments.  *See Cobell v. Babbitt*, 91 F. Supp. 2d 1, 9 (D.D.C. 1999) *aff'd and remanded sub nom. Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001).

The Bureau of Indian Affairs is responsible for the management of trust lands such as plaintiffs' allotments.  Specifically, for the purpose of this case, the Indian Long-Term Leasing Act, 25 U.S.C. § 396, 112 Stat. 620 (1998), places control over the lease of allotted lands for mining purposes with the BIA.[8]  No oil or gas lease of allotted land may be executed unless the BIA determines that the lease is "in the best interest of the Indian owners of the Indian land."  25 U.S.C. § 396.  The BIA has a fiduciary duty to ensure that the Indians' mineral resources "will be developed in a manner that maximizes their best economic interests and minimizes any

---

[6] *See, e.g.,* Lenny Bernstein, *Northern plains site has twice as much oil as previously thought, Interior says*, WASHINGTON POST, April 30, 2013, http://www.washingtonpost.com/national/health-science/northern-plains-site-has-twice-as-much-oil-as-previously-thought-interior-says/2013/04/30/16e0a436-b1cf-11e2-9a98-4be1688d7d84_story.html; *National Assessment of Oil and Gas Fact Sheet*, U.S. Geological Survey, April 2013, http://pubs.usgs.gov/fs/2013/3013/fs2013-3013.pdf.  *See also* Compl. ¶¶ 35-49.

[7] "Allotment is a term of art in Indian law. . . . It means a selection of specific land awarded to an individual allottee from a common holding."  *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 142 (1972) (citations omitted).

[8] Under the Indian Long-Term Leasing Act, 25 U.S.C. § 396 *et seq*, "[a]ll lands allotted to Indians in severalty . . . may by said allottee be leased for mining purposes for any term of years as may be deemed advisable by the Secretary of the Interior."

adverse environmental impacts or cultural impacts resulting from such development."  25 C.F.R. § 212.1(a).

As mentioned above in the introduction, the gravamen of plaintiffs' complaint is that the BIA breached this fiduciary duty by "rubber stamping" oil and gas lease agreements with below market bonuses, by failing to secure a royalty interest rate above 18 percent, and by allowing the "flipping" or reassignment of leases without allottee consent or compensation.  Compl. ¶¶ 63-75. The following facts are taken from both the Complaint and the affidavit provided by Renita Wolf, one of defendant's expert witnesses, and are undisputed, except as otherwise noted.

Both Ms. Two Shields and Ms. Wilson have an interest in Allotment M 868A, a 314.180 acre tract of land located on the Fort Berthold Indian Reservation.  Compl. ¶¶ 103-104, 137-138; Def.'s Wolf Decl. at ¶¶ 3-4 [App. Ex. 2 at 21].   Ms. Two Shields also has an interest in Allotment 651A, a 320 acre tract of land located on the Fort Berthold Indian Reservation. Compl. ¶¶ 103, 137; Def.'s Wolf Decl. at ¶ 3.   Defendant alleges that in November 2007, the BIA initiated a competitive lease sale involving 2,087 parcels on the Fort Berthold Indian Reservation, including Allotments M868A and 651A.  Def.'s Wolf Decl. at ¶ 5.[9]

On December 19, 2007, the BIA approved a five-year oil and gas mining lease of Allotment 651A to Zenergy Properties LLC ("Zenergy"), an oil and gas producer, for a lease bonus (*i.e.*, a one time, up-front payment) of $451.48 per acre and a royalty rate (*i.e.*, a percentage of profits based on resources extracted) of 18 percent.  Compl. ¶¶ 103, 137; Def.'s Wolf Decl. at ¶ 6.  On April 28, 2009, the BIA approved the assignment of this lease by Zenergy to Dakota-3 E&P Company, LLC ("Dakota-3"), another oil and gas producer.[10]  Plaintiffs allege that this assignment was made without their prior knowledge or consent.  Compl. ¶¶ 103, 137.

The parties also allege that on February 24, 2008, the BIA approved a five-year oil and gas mining lease of Allotment M 868A to Zenergy, for a lease bonus of $400 per acre and a royalty rate of 18 percent.  Compl. ¶¶ 104, 138; Wolf Decl. at ¶ 8.  On April 21, 2009, BIA approved the assignment of this allotment to Dakota-3.[11]  Compl. ¶¶ 104, 138.  Plaintiffs allege that this assignment was made without their prior knowledge or consent.  *Id.*

Even more broadly, plaintiffs allege that the allotments of many putative class members were leased at a lower bonus price.  For instance, plaintiffs allege that between June 2006 and January 2008, the BIA approved the tribal lease of 42,500 acres located on the Fort Berthold

---

[9] As will be evident further below, plaintiffs do not directly dispute the fact that the leases were subject to a "competitive lease sale," but allege that the terms of the leases did not represent fair market value.  *See, e.g.*, Compl. ¶ 24.

[10] There is a discrepancy over the exact dates on which the BIA approved the assignment of each lease—Ms. Wolf avers that the BIA approved the assignment on April 10, 2009, rather than April 28, 2009.  Compl. ¶¶ 103, 137; *c.f.* Def.'s Wolf Decl. at ¶ 6.  Nevertheless, the court finds that this difference is not material to defendant's motion for summary judgment.

[11] Ms. Wolf avers that this assignment was approved on April 10, 2009.  Def.'s Wolf Decl. at ¶ 9.

Indian Reservation to Dakota-3 for a lease bonus of only $50 per acre[12] and a royalty rate of 18 percent.

Plaintiffs allege that the terms of these leases were far below market value.  Compl. ¶¶ 63-75.  In the first place, plaintiffs point out that on November 15, 2010—a little over two years after the BIA approved these leases—Dakota-3 re-leased plaintiffs' allotments to Williams Cos., Inc. ("Williams") for roughly $10,000 per acre,[13] which is roughly twenty times the bonus price under the terms of the original lease.  ¶¶ 117-121.  Plaintiffs also point out that around the same period that the BIA approved the lease of plaintiffs' allotments for about $500 per acre, land in close proximity was leased for a bonus price of $2,000 an acre or higher.  Compl. ¶ 77.  Plaintiffs also note that other comparable allotments in the vicinity were leased at a much higher royalty rate.  For instance, plaintiffs allege that in December 2007, Peak North Dakota, LLC, entered into several leases for a bonus of $1,000 and an 18 percent royalty, and in the case of two other leases, a bonus of $1,000 per acre and a royalty of 22.5 percent.  Compl. ¶ 79.  Plaintiffs also allege that in April 2008, "at least one lease within the outer boundaries of Fort Berthold but owned in fee simple by a non-Native American went for a bonus of $500 per acre and a 20 percent royalty rate."  Compl. ¶ 80.  According to plaintiffs, a mere 2 percent increase in royalty rate can result in significantly greater revenues.[14]  Compl. ¶ 106.

In short, plaintiffs argue that the BIA breached its fiduciary duty by failing to lease the allotments held in trust at market rates and by including other unfavorable terms.  In this case, however, plaintiffs' breach of fiduciary duty claim is largely overshadowed by the *Cobell* litigation, mentioned briefly above in the introduction.  *Cobell*, also a class action, has already been litigated and settled.  Defendant argues, in its motion to dismiss and for summary judgment, that plaintiffs' breach of fiduciary duty claims were included in the *Cobell* litigation, and that plaintiffs' failure to opt out of the settlement releases the government from any liability on the matter before the court.  The court now proceeds with a brief overview of the sprawling *Cobell* litigation, which ran from 1996 until 2012.

## B. The *Cobell* Litigation and Settlement Agreement

The original *Cobell* class action complaint was filed in 1996, on behalf of more than 300,000 Native Americans.  *See Cobell v. Babbitt*, 30 F. Supp. 2d 24, 28 (D.D.C. 1998).  The plaintiffs in that case alleged that the government had mismanaged their Individual Indian Money ("IIM") accounts and had failed to account for billions of dollars relating to the lease of

---

[12] NB: elsewhere the complaint describes the bonus price as $40 per acre.  *See* Compl. ¶ 82 ($40 per acre); *c.f.* Compl. ¶¶ 12, 64, 76 ($50 per acre).

[13] Plaintiffs do not provide a breakdown of the bonus price and royalty rate for these leases, but state that "Williams Companies paid Dakota-3 $925 million for 85,000 acres of tribal and allottee mineral leases on the Fort Berthold Reservation," which amounts to "approximately $10,000 per acre."  Compl. ¶ 113.

[14] Defendant does not address whether these more favorable terms reflect BIA mismanagement or a rapid rise in the value of the mineral rights.  Rather, as intimated above, defendant argues that any claims arising from the 2007 and 2008 leases is covered by the *Cobell* Settlement.

allotments for oil extraction and logging.[15]  Turning this class action into something approaching a nightmare, the government had lost or destroyed much documentation relating to the IIM accounts.  *Id*. at 46.  Although the Indian Trust Fund Management Reform Act of 1994 required a full historical accounting of individual accounts, the federal government only provided the Office of the Special Trustee for American Indians ("OST") a fraction of the funds that would have been required for such an accounting.  *Cobell v. Norton*, 240 F.3d 1081, 1092 (D.C. Cir. 2001).

On December 21, 1999, the district court found that defendants had breached their respective statutory trust duties.  *Cobell v. Babbit*, 91 F. Supp. 2d 1, 58 (D.D.C. 1999), *aff'd and remanded sub nom. Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001).  The district court went as far as to hold a number of U.S. officials, including the Secretary of the Interior, in contempt, an action that was eventually countermanded by the Court of Appeals for the District of Columbia Circuit ("D.C. Circuit").  *See Cobell v. Babbitt*, 37 F. Supp. 2d 6, 38 (D.D.C. 1999); *Cobell v. Norton*, 226 F. Supp. 2d 1, 19-20 (D.D.C. 2002); *c.f. Cobell v. Norton*, 334 F.3d 1128, 1148-50 (D.C. Cir. 2003) (holding that the district court erred as a matter of law in holding Secretary Norton in criminal contempt).

Aside from the acrimony among the parties, the *Cobell* litigation was controversial for other reasons.  To begin with, it is doubtful that the Federal District Court for the District of Columbia had jurisdiction in the first place, as the Tucker Act—read in conjunction with the Little Tucker Act—gives the Court of Federal Claims exclusive jurisdiction over money claims against the government not sounding in tort, unless the relief demanded by plaintiff is $10,000 or less.  *See* 28 U.S.C. § 1491(a)(1); *c.f.* 28 U.S.C. § 1346(a)(2) (allowing federal district courts to hear claims "not exceeding $10,000 in amount").[16]  Congress eventually addressed this jurisdictional deficiency by retrospectively conferring jurisdiction on the federal district court over the *Cobell* litigation.[17]

Eventually, in December 2009, the *Cobell* parties entered into a settlement agreement.  *See Cobell* Settlement Agreement, ECF No. 3660-2 [attached as Def.'s Ex. 4, ECF No. 6-2].  The Settlement would be "contingent on the enactment of legislation to authorize or confirm aspects of the Settlement."  *Id.* at B.1 [Def.'s Ex. 4 at 67].  The Settlement Agreement provided that following the enactment of the legislation, an amended complaint would be filed,

---

[15]  The IIM accounts, which were initially created under the General Allotment Act of 1887, serve to provide Indians revenue from the exploitation of the lands held in trust for them.  The BIA distributes this revenue on a pro rata basis by placing it in the appropriate IIM accounts, which are also held in trust by the federal government for the benefit of individual Indians.  *See Cobell v. Norton*, 240 F.3d 1081, 1088 (D.C. Cir. 2001).

[16]  *See generally* discussion in Gregory C. Sisk, *The Jurisdiction of the Court of Federal Claims and Forum Shopping in Money Claims Against the Federal Government*, 88 Ind. L.J. 83, 97, 103-05 (2013).

[17]  The Claims Resolution Act provides that "[n]otwithstanding the limitation on the jurisdiction of the district courts of the United States in section 1346(a)(2) of title 28, United States Code, the United States District Court for the District of Columbia shall have jurisdiction of the claims asserted in the Amended Complaint for purposes of the Settlement."  Pub. L. No. 111-291, § 191, 124 Stat. 3064, 3066-67.

concurrently to the Settlement Agreement, "for the sole purpose of settling" the litigation. *Id*. at A.2 [Def.'s Ex. 4 at 58].

The Amended Complaint set forth two classes. The Historical Accounting Class consists of "individual Indian beneficiaries . . . who had an IIM Account open [with at least one cash transaction credited to it] between October 25, 1994 and [September 30, 2009]." *Id*. at A.15 [Def.'s Ex. 4 at 62]. The Trust Administration Class consists of "individual Indian beneficiaries . . . who [had] an IIM account in the 'Electronic Ledger Era,'" which dates from approximately 1985 to the present, or had, as of September 30, 2009, "a recorded or other demonstrable ownership interest in land held in trust or restricted status." *Id*. at A.35 [Def.'s Ex. 4 at 66]. Of the two classes, only the Trust Administration Class was an opt-out class. *Id*. at C.2 [Def.'s Ex. 4 at 71].

In its motion to dismiss and for summary judgment, defendant proffers evidence that plaintiffs Two Shields and Wilson were members of both the *Cobell* Historical Accounting Class and the Trust Administration Class. Michelle D. Herman, an expert for the government, examined the combined *Cobell* dataset,[18] which has unique identifying numbers for people (NABN) and for accounts (NAAN). Ms. Herman identified one NABN and two NAANs for Two Shields. Herman Decl. at ¶ 10 [App. Ex. 1 at 3]. Ms. Herman also "identified three NABNs associated with some derivation of the name Mary Louise Defender Wilson Packineau ('Mary L. Wilson,' 'Mary Defender,' and 'Mary J. Packineau Hale') with an interest in tract 301 M 868A. *Id*. at ¶¶ 12-13.[19] This information is consistent with plaintiffs' allegation that they have an interest in Allotments M 868A and 651A. *See* Compl. ¶¶ 103-104, 137-138; *see also* Def.'s Wolf Decl. at ¶¶ 3-5 [Def.'s Ex. 2 at 21].

In addition to specifying two different types of classes, the *Cobell* Settlement Agreement set forth several different types of claims. The *Cobell* Settlement covered, *inter alia*, the *Cobell* class action plaintiffs' claims for a historical accounting (*i.e.*, "historical accounting claims"), which had been the subject of the *Cobell* litigation since 1996. Under the terms of the Amended Complaint and the *Cobell* Settlement, plaintiffs with historical accounting claims were organized in a "Historical Accounting Class." *See Cobell* Settlement Agreement at I.1 [Def.'s Ex. 4 at 95-96].

But after years of litigation, the government apparently desired to settle not only the accounting claims raised by plaintiffs in the *Cobell* litigation, but also a number of claims relating to government mismanagement of funds and land owned by Indians. *See Cobell* Settlement Agreement at Background, ¶ 10 [Def.'s Ex. 4 at 56] ("Recognizing that individual

---

[18] This combined dataset includes both the Department of the Interior's Integrated Records Management System (IRMS) and the Trust Funds Accounting System (TFAS). According to Herman, these two datasets, "in conjunction . . . represent the most complete, accessible source of individual Indian account and transaction data from early 1985 through present." Herman Decl. at ¶ 7 [App. Ex. 1 at 7].

[19] Defendant acknowledges that "[t]here are three individuals with similar names that share an interest in tract 301 M 868A," but states that "based upon the information contained in the complaint, the United States understands plaintiff to be Mary L. Wilson of the Standing Rock Sioux Tribe (NABN x9982)." Def.'s Mot., ECF No. 6-1, at 7 n.3 (citations omitted).

Indian trust beneficiaries have potential additional claims arising from Defendants' management of trust funds and trust assets, Defendants have an interest in a broad resolution of past differences in order to establish a productive relationship in the future."). Accordingly, the Amended Complaint included not only accounting claims against the government but also, for the first time, "funds administration claims" and "land administration claims," which were held by the Trust Administration Class. *See* Amended Complaint at XI(36) [attached as Def.'s Ex. 3, ECF No. 6-2, at 44]; *Cobell* Settlement Agreement at A.35 [Def.'s Ex. 4 at 66]. This new category of land administration claims is of particular relevance here because the government argues that plaintiffs' Count I claims are land administration claims that already have been settled under the Settlement Agreement.

The Settlement Agreement defines "land administration claims" as "known and unknown claims that could have been asserted through the Record Date [Sept. 30, 2009] for . . . alleged breach of trust and fiduciary mismanagement of land, oil, natural gas, mineral, timber . . . situated on, in or under [plaintiffs'] Land." *Cobell* Settlement Agreement at ¶ A.21 [App. Ex. 4, ECF No. 6-2, at 63-64]. Such claims include a wide variety of actions or omissions on the part of defendant, including:

> a. Failure to lease Land, approve leases or otherwise productively use Lands or assets;
>
> b. Failure to obtain fair market value for leases, easements, rights-of-way, or sales;
>
> c. Failure to prudently negotiate leases, easements, rights-of-way, sales or other transactions;
>
> d. Failure to impose and collect penalties for late payments; . . .
>
> j. Claims of like nature and kind arising out of allegations of Interior Defendants' breach of trust and/or mismanagement of Land through the Record Date, that have been or could have been asserted.

*Id.*

The Settlement Agreement provided compensation to class members, pursuant to the Claims Resolution Act of 2010, Pub. L. No. 111-291, § 191, 124 Stat. 3064, 3066-67. Additionally, and of particular importance in this case, the Settlement Agreement provided that upon final approval of the settlement, members of the Trust Administration Class who fail to opt out

> shall be deemed to have released, waived and forever discharged [the United States] from, and . . . shall be deemed to be forever barred and precluded from prosecuting, any and all claims . . . that were, or should have been, asserted in the Amended Complaint when it was filed, on behalf of the Trust Administration Class . . . in connection with . . . matters stated in the Amended Complaint for Funds Administrations Claims or Land Administration Claims . . . .

*Cobell* Settlement Agreement at ¶ I.2 [Def.'s Ex. 4 at 96].

In December 2010, Congress passed the Claims Resolution Act of 2010, which appropriated a settlement amount of $3.4 billion and "authorized, ratified and confirmed" the Settlement Agreement as modified by the parties. Pub. L. No. 111–291, 124 Stat. 3064, 3066. On Dec. 21, 2010, the *Cobell* plaintiffs filed an amended complaint pursuant to the terms of the Settlement Agreement, as authorized by the Claims Resolution Act of 2010. *See Cobell* Am. Compl., ECF No. 3671; *Cobell* Settlement Agreement, ECF No. 3660-2. On that very day, the district court granted preliminary approval of the Settlement Agreement. Order of Dec. 21, 2010 (*Cobell* ECF No. 3667) [Def.'s Ex. 8, ECF 6-2, at 403-6]. The court ordered that plaintiffs who wished to opt out of the Trust Administration Class had 120 days to postmark their opt out or objection forms—*i.e.*, until April 21, 2011. *Id.* at ¶ 11 [Def.'s Ex. 8 at 405].

In its motion to dismiss and for summary judgment, defendant alleges that plaintiffs failed to opt out of the *Cobell* Settlement Agreement. Defendant points out that as of May 4, 2011, the Claims Administrator received 1,826 timely notices, in addition to 39 late notices, for a total of 1,865. *See* Keogh Decl. at ¶ 3 [Def.'s Ex. 9, ECF No. 6-2, at 408]; *see also* July 27, 2011, Order Granting Final Approval of Settlement (*Cobell* ECF No. 3850) Ex. A and B [Def.'s Ex 6, ECF No. 6-2, at 191-230] (listing the names of individuals who had opted out of the Settlement Agreement). The court notes that plaintiffs' names are not among the ones listed in the court order. *Id.*

On July 27, 2011, the District Court certified both the Historical Accounting Class and the Trust Administration Class. Order Granting Final Approval to Settlement (*Cobell* ECF No. 3850) at 5 [Def.'s Ex. 6 at 182-83]. The court noted that notice of the Settlement, and of class members' opt-out right, had been mailed to "[a] list of all readily identifiable Class Members whose names and addresses were readily available and provided by the Department of the Interior . . . , or whose addresses could be reasonably obtained through advanced legal research." Kinsella Decl. at ¶ 11 [App. Ex. 7 at 236]. Notice also had been provided in print media, by radio, on the internet, and on television. *Id.* at ¶¶ 22-33.

The certification of the *Cobell* class also proved contentious for several reasons. First and foremost, the Claims Resolution Act of 2010 permitted certification of the Trust Administration Class "[n]otwithstanding the requirements of the Federal Rules of Civil Procedure." Pub. L. No. 111-291, § 191, 124 Stat. 3064, 3066-67. A number of settlement protesters argued, on appeal, that exempting the Settlement from the requirements of Rule 23 of the Federal Rules of Civil Procedure ("FRCP")[20] violated the Fifth Amendment due process rights of class members. The *Cobell* protesters characterized the Trust Administration Class as "sprawling,"[21] and also argued that Elouise Cobell's request for a $13 million incentive payment

---

[20] FRCP 23(a) permits the certification of class action suits only if the following conditions are satisfied: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

[21] The Trust Administration Class, as one of the *amici* argued,

> covered a wide variety of conduct, including allegations that the federal government did not keep adequate records (in some cases destroying them), did not account to the trust beneficiaries with respect to the money they were owned,

created an impermissible conflict between the interests of the named class representatives and the unnamed members of the class.  *See* Opening Brief of Appellant Craven at in *Cobell v. Salazar*, D.C. Cir. No. 11-5205 [ECF No. 14-1, Ex. 1 at 35-48].

Despite these concerns, the District Court granted final approval to the Settlement Agreement on June 27, 2011.  Order Granting Final Approval to Settlement at 3-4 [App. Ex. 6, ECF No. 6-2, at 180-81].  The district court noted that the parties were facing "years of litigation . . . with rather dubious chances of ultimate success," and that the Settlement "at least now provides some measure of certainty for most class members."  Fairness Hr'g Tr. At 213-14, 217.  The District Court found "that the terms of the [S]ettlement [were] 'fair, reasonable and adequate' from the perspective of absent class members" and that the proposed settlement provided adequate notice and opportunity to be heard.  *Id*. at 217.  Order Granting Final Approval to Settlement at 4.

The District Court ordered that the Settlement Agreement be "binding on all members of the Trust Administration Class who are not identified among the excluded members"—*i.e.*, binding on those who had failed to opt out—and also ordered that "[s]uch members . . . shall be deemed to have released, waived and forever discharged" the United States from land administration claims.  *Id*. at 8.  Final judgment was entered on Aug. 4, 2011.  Judgment in a Civil Action (*Cobell* ECF No. 3853) [App. Ex. 10 at 453].  The Court of Appeals for the D.C. Circuit affirmed this judgment on May 22, 2012.  *Cobell v. Salazar*, 679 F.3d 909 (D.C. Cir. 2012); *Good Bear v. Salazar*, 2012 WL 1884702 (D.C. Cir. May 22, 2012).  The Settlement Agreement became effective on Nov. 24, 2012, after all possible appeal periods had expired.  *See* Order, *Cobell* ECF No. 3923, Dec. 11, 2012 [App. Ex. 11 at 454-57].

## C. Procedural History and Issues Before the Court

Plaintiffs filed the instant complaint on February 1, 2013.  Plaintiffs argue, in Count I, that the BIA has a fiduciary duty to maximize the economic interests of Indian allottees by prudently managing their allotments, and that the BIA breached that duty by "rubber stamping" oil and gas lease agreements with below market bonuses, by failing to secure a royalty interest rate above 18 percent, and by allowing the reassignment of leases without allottee consent or compensation.  Compl. ¶¶ 63-75.  Plaintiffs allege that this mismanagement has caused named plaintiffs and putative class members millions of dollars in damages— plaintiffs point out that only two and a half years after the BIA initially approved the leases, these leases were assigned

---

obstructed the appointment of a proper Special Trustee, mismanaged trust funds, lost trust funds, under-invested trust funds, charged improper administrative fees, did not investigate charges of embezzlement, and mismanaged land and resources, including oil, natural gas, mineral, timber, grazing, and other resources and rights by, among other things, not leasing land, not getting fair market values for land they did lease, and other instances of mismanagement.  The list of alleged transgressions is long and varied, and contains a number of activities that are mutually exclusive from each other.  (The government could not, for example, under-invest funds it had failed to invest, or imprudently negotiate the lease of land that it had failed to lease).

Amicus Curiae Brief of Competitive Enterprise Institute in Support of Movant-Appellant Kimberly Craven, No. 11-5205, 2011 WL 5093118 at17-18 (C.A.D.C. Oct. 26, 2011).

for a bonus price roughly twenty times higher than the bonus price under the original terms of the lease.  Compl. ¶¶ 113-121, 157.

Defendant filed a motion to dismiss and for summary judgment ("Def.'s Mot. Dismiss") on March 29, 2013.  In this motion, defendant argues that plaintiffs are certified class members in *Cobell v. Salazar*, D.D.C. No. 96-cv-1285, who "did not opt-out of the Trust Administration Class" and thereby "released the United States from any liability associated with oil and gas leasing of their allotted land that occurred prior to September 30, 2009."  Def.'s Mot. Dismiss at 1.  Defendant concludes that it is entitled to summary judgment, pursuant to Rule 56(b) of the Rules of the Court of Federal Claims ("RCFC").  *Id.*

Plaintiffs, in turn, assert that the Settlement Agreement does not encompass their Count I claims and argue that in any event, they are entitled to discovery on the matter.  *See generally* Pl.'s Opp'n Mot. Dismiss, ECF No. 11, at 8-22.  Defendant opposes discovery on the ground that the Settlement Agreement is unambiguous and that any discovery would be futile in raising a genuine issue of material fact.  Def.'s Reply, ECF 14, at 15-17.

Plaintiffs argue, in Count II, that the United States breached a separate fiduciary duty to disclose to interested parties that the *Cobell* litigation includes potential claims against the government in connection with the leasing of mineral rights located on the Fort Berthold Indian Reservation.  Compl. ¶¶ 159-179.  Defendant, in turn, argues that the court has no jurisdiction to hear Count II because plaintiffs fail to allege a specific source of federal law for the government's alleged duty to disclose, as required by the Tucker Act and precedents of the Court of Appeals for the Federal Circuit ("Federal Circuit").  Defendant, accordingly, moves for dismissal of Count II for lack of subject matter jurisdiction, pursuant to RCFC 12(b)(1).  Def.'s Mot. Dismiss at 18-21.

Finally, plaintiffs argue that even if defendant prevails on Counts I and II, plaintiffs are still entitled to damages under the theory that the Claims Resolution Act of 2010 amounts to a legislative taking of plaintiffs' Count I and II claims, in violation of the Fifth Amendment of the United States Constitution.  Compl. ¶¶ 180-193.  Defendant, in its motion to dismiss, argues that a claim against the government is not a cognizable property interest for purposes of the Fifth Amendment.  Def.'s Mot. Dismiss at 36-38.  Defendant also argues that even if there were a taking of a property interest, plaintiffs have received just compensation as members of the *Cobell* Settlement Class.  *Id.* at 35.  Defendant accordingly requests the court to dismiss Count III for failure to state a claim, pursuant to RCFC 12(b)(6).

Additionally, on June 28, 2013, defendant filed a motion requesting the court to take judicial notice of the June 20, 2011, transcript of the fairness hearing in *Cobell v. Salazar*, No. 96-cv-1285, ECF No. 3842-1 (D.D.C. June 20, 2011) (attached by defendant as Ex. 1, ECF No. 17).  Plaintiffs' oppose this request, and also seek leave to file a sur-reply regarding defendant's motion for judicial notice.

The following five issues remain for the court's resolution:

1) Whether to grant defendant's motion for judicial notice and plaintiffs' motion for sur-reply;

2) Whether the *Cobell* Settlement Agreement precludes plaintiffs from pursuing their Count I claims, entitling defendant to summary judgment as to Count I;

3) Whether plaintiffs are entitled to discovery as to Count I;

4) Whether the court lacks subject matter jurisdiction to hear Count II, and

5) Whether defendant is entitled to dismissal of Count III for failure to state a plausible claim for relief.

The court will now address these issues *seriatim.*

## II. APPLICABLE LEGAL STANDARDS

As a preliminary matter, any federal court must determine its jurisdiction to hear a case before it advances to the merits, regardless of whether the court's jurisdiction is raised by the parties. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (citing *Ex parte McCardle*, 7 Wall. 506, 514 (1868)). In "determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (2011). Nonetheless, the burden of establishing the court's subject matter jurisdiction lies with the party seeking to invoke it. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)). When the court's jurisdiction is challenged, the plaintiff must establish jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

For the Court of Federal Claims, it is primarily the Tucker Act that confers upon it jurisdiction to adjudicate money claims against the United States. This Act, in particular, grants this court jurisdiction over claims against the United States founded on a money-mandating source of law and not sounding in tort. 28 U.S.C. § 1491(a)(1). The Indian Tucker Act, 28 U.S.C. § 1505, confers essentially the "same access" to relief. *United States v. Mitchell*, 445 U.S. 535, 540 (1980).

Although the Tucker Act explicitly waives the sovereign immunity of the United States against such claims, it "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Rather, in order to fall within the scope of the Tucker Act, "a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part).

Native Americans asserting a breach of fiduciary claim under the Tucker Act or Indian Tucker Act must clear "two hurdles" to invoke federal jurisdiction. *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) ("*Navajo II*"). "First, [plaintiffs 'must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties.'" *Id.* (internal citations omitted). The government's duties must be defined by "specific, applicable, trust-creating statute[s] or regulation[s]," not "common-law trust principles." *Id.* at 302. Second, "[i]f that threshold is passed," plaintiffs

must show that "the relevant source of substantive law can be fairly interpreted as mandating compensation for damages sustained as a result of a breach of the duties" imposed by the governing law. *Id*. at 291 (citation omitted).

As for defendant's motion to dismiss under RCFC 12(b)(6), such motions test the legal sufficiency of a complaint in light of RCFC Rule 8(a), which requires "a plausible 'short and plain' statement of the plaintiff's claim, showing that the plaintiff is entitled to relief." *K-Tech Telecommunications, Inc. v. Time Warner Cable, Inc*., 714 F.3d 1277, 1282 (Fed. Cir. 2013) (quoting *Skinner v. Switzer*, 131 S. Ct. 1289, 1291 (2011)).  The court should begin to assess the sufficiency of the complaint by identifying allegations that can be disregarded as legal conclusions.  Although the court must "assume [the] veracity" of "well-pleaded factual allegations," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), "conclusory allegations are not entitled to be assumed as true." *Ashcroft*, 556 U.S. at 681.  Although a complaint "does not need detailed factual allegations," the plaintiff must plead enough factual allegations "to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Accordingly, the court should dismiss a complaint "when the facts asserted by [the] claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

As to the instant summary judgment motion pursuant to RCFC 56(a), the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In considering a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party without weighing the evidence or making credibility determinations. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Nonetheless, mere conclusory allegations are not sufficient to withstand summary judgment, for a dispute is "genuine" only if there are factual issues that "may reasonably be resolved in favor of either party."  *Marriott Intern. Resorts, L.P. v. United States*, 586 F.3d 962, 968 (Fed. Cir. 2009) (*citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986)).  Moreover, a factual dispute is only material if it may "affect the outcome of the suit" in light of the substantive law governing the suit. *Marriott*, 586 F.3d at 968 (quoting *Anderson*, 477 U.S. at 250).  The party opposing the motion has the burden of proving by sufficient evidence that a genuine issue of material fact actually exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986); *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970).

### III. DISCUSSION

### A. The Court Grants-in-Part Defendant's Motion for Judicial Notice

On June 28, 2013, defendant filed a motion requesting that the court take judicial notice of a June 20, 2011, transcript of the fairness hearing in *Cobell v. Salazar*, No. 96-cv-1285, ECF No. 3842-1 (D.D.C. June 20, 2011) (attached by defendant as Ex. 1, ECF No. 17).  Defendant requests that the court take judicial notice of the district court's public findings to address several assertions made by plaintiff in its opposition brief.  For instance, plaintiffs assert, in the opposition brief, that their claims are "unique" because none of the named class representatives had any "interest in . . . the specific Fort Berthold allottee oil and gas lease claims at issue in this case."  Plaintiffs' Opp'n to MTD, ECF No. 11, at 2.

Defendant, in turn, argues that this assertion is belied by the fact that one of the *Cobell* objectors "was a member of the Three Affiliated Tribes and specifically raised oil and gas leasing issues on the Fort Berthold Reservation at the fairness hearing."  Def.'s Mot. Judicial Notice, ECF No. 17, at 3 (citing Hearing Tr. at 48:15-20).  Also, plaintiffs characterize the government's summary of the compensation to be awarded to members of the Trust Administration Class under the  Settlement as "specious," "improper," and "unfounded." Plaintiffs' Opp'n to Mot. Dismiss, ECF No. 11, at 44 (referring to Def.'s Mot. Dismiss, ECF 6-1, at 27-28).  Defendant argues that its account of the compensation provisions is supported by statements made by plaintiffs' class counsel during the Fairness Hearing.  Def.'s Mot. Judicial Notice, ECF No. 17, at 1 (citing Hearing Tr. at 16:7-11).

This court adheres to Rule 201 of the Federal Rules of Evidence when invoking judicial notice.  *See, e.g., Osage Tribe of Indians of Oklahoma v. United States*, 96 Fed. Cl. 390, 401 (2010); *Global Computer Enterprises, Inc. v. United States*, 88 Fed. Cl. 52, 70 (2009).  Pursuant to Rule 201, the court may take notice of adjudicative facts that are "not subject to reasonable dispute" and may do so "if a party requests it and the court is supplied with the necessary information."  Fed. R. Evid. 201(b)-(c).

The court finds that defendant's request is neither untimely nor prejudicial to plaintiffs. Defendant only seeks to elicit facts in response to plaintiffs' accusation that defendant had made "specious" and "unfounded" statements in its briefing.  Defendant filed its motion for judicial notice promptly, only one day after plaintiffs' response was filed.  Additionally, the court finds that the transcript of the *Cobell* Fairness Hearing is relevant, but that not all of the facts therein are beyond "reasonable dispute."  The court, accordingly, takes judicial notice of the transcript of the *Cobell* Fairness Hearing, but only for the following purposes.

1) The court takes judicial notice of the account provided by the class action plaintiffs' counsel regarding compensation for class members for the purpose of showing what was contemplated in the settlement of Land Administration Claims, and to show that defendant's account was not "specious" or "unfounded," but not for the purpose of establishing what compensation was actually awarded.

2) The court takes judicial notice of Ms. Goodbear's objection to the Settlement, but only for the purpose of showing "that Fort Berthold oil leasing was open and notorious at the time the District Court approved the Cobell Settlement Agreement."  Def.'s Reply in support of Mot. Judicial Notice, ECF No. 19, at 3.

The court, in its discretion, grants plaintiffs' request for leave to file a sur-reply, and accepts the attached memorandum as filed on July 26, 2013.

**B. Defendant Is Entitled to Summary Judgment As to Count I Because the *Cobell* Settlement Discharged Defendant of Liability for Any Claim Covered by the Settlement Agreement**

In Count I, plaintiffs argue that the Bureau of Indian Affairs, an agency within the Department of the Interior, breached its fiduciary duty to maximize the interests of Indians in the

management of their allotted properties.  The Court has subject matter jurisdiction over Count I, pursuant to the Tucker and Indian Tucker Acts.[22]

As explained above, plaintiffs allege that the BIA failed to compare the per acre lease bonuses it approved with the much higher prices it could have been obtained.  Plaintiffs argue that, on account of this failure, they received below-market acre bonuses.  Compl. ¶¶ 153-54. Plaintiffs also allege that the BIA failed to secure a royalty interest above 18 percent or lease terms of fewer than five years.  Compl. ¶ 155.  Plaintiffs further allege that the BIA breached its fiduciary duty by allowing the "flipping" or reassignment of leases without allottee consent and compensation.  Compl. ¶ 156.

Defendant argues that the terms of the *Cobell* Settlement Agreement preclude plaintiffs from asserting these breach of fiduciary duty claims, and that it is accordingly entitled to summary judgment on the issue.  As explained above, the release clause of the *Cobell* Settlement Agreement states that members of the *Cobell* Trust Administration Class who failed to opt out of the *Cobell* Settlement Agreement are barred from prosecuting land administration claims against the government.[23]  "Land administration claims," as stated above, are "known and unknown claims that have been or could have been asserted through [Sept. 30, 2009] for [DOI's] alleged breach of trust and fiduciary mismanagement of land, oil, natural gas, mineral, timber . . . situated on, in or under [plaintiffs'] Land . . . ."  *Cobell* Settlement Agreement, ¶ A.21 [App. Ex. 4 at 63-64].

In short, the release clause applies to plaintiffs only if the following conditions are satisfied: if plaintiffs are (1) members of the Trust Administration Class, (2) failed to opt out of the Settlement Agreement, and (3) seek to pursue land administration claims—i.e., claims of fiduciary mismanagement of trust land that "have been or could have been asserted through" the Record Date of September 30, 2009.  *Id.*  Defendant argues that all three of these conditions are satisfied and that the United States is accordingly discharged of any further liability associated

---

[22] The Tucker and Indian Tucker Acts confer upon this court jurisdiction to hear breach of fiduciary claims against the government, as long as the plaintiff identifies a substantive source of law that establishes a specific fiduciary duty and alleges that the government breached that duty. *See Navaho II*, 556 U.S. at 290-291, 302.  As explained above, the Indian Long-Term Leasing Act, 25 U.S.C. § 396 *et seq*, states that the BIA has a fiduciary duty to prudently manage allotments in the interests of Indian property owners.  Plaintiffs allege, in Count I, that defendant breached this duty.  Therefore, the court has jurisdiction over this claim.

[23] The release clause of the *Cobell* Settlement Agreement provides that upon final approval of the settlement, members of the Trust Administration Class who fail to opt out

> shall be deemed to have released, waived and forever discharged [the United States] from, and . . . shall be deemed to be forever barred and precluded from prosecuting, any and all claims . . . that were, or should have been, asserted in the Amended Complaint when it was filed, on behalf of the Trust Administration Class . . . in connection with . . . matters stated in the Amended Complaint for Funds Administrations Claims or Land Administration Claims . . . .

*Cobell* Settlement Agreement, ¶ I.2 [App. Ex. 4, ECF No. 6-2, at 96].

with oil and gas leasing of plaintiffs' allotted land other than the relief provided to class members under the terms of the Settlement. Def.'s Mot. Dismiss at 1.

Plaintiffs do not contest that they failed to opt out of the Settlement Agreement, but argue that the Agreement does not encompass their claims for the following reasons. First, plaintiffs refuse to concede, without discovery, that they are members of the Trust Administration Class. Second, plaintiffs point out that "land administration claims" include only "known and unknown claims that have been or could have been asserted through the Record Date [of September 30, 2009]." Plaintiffs argue that Count I "could not have been asserted through the Record Date" because plaintiffs did not become fully aware of the extent of their damages until Dakota-3 assigned the leases to Williams, an event that happened 14 months after the Record Date. Third, plaintiffs argue that other aspects of the Settlement Agreement—namely, the payment mechanics of the agreement and the fact that the agreement does not mention the general leasing statute that encompasses the Two Shields claims—proves that the Cobell Agreement "did not and could not include plaintiffs' *Two Shields* claims." Pl.'s Opp'n at 26. Finally, plaintiffs argue that defendant's motion for summary judgment is premature and that they are "entitled to discovery to determine the basis for, the veracity of, and the complete context" of defendant's factual allegations. Pl.'s Opp'n, ECF No. 11, at 7.

The court finds, for the reasons that follow, that plaintiffs are members of the Trust Administration Class and that plaintiffs seek to pursue land administration claims against the government. Since plaintiffs failed to opt out of the Settlement Agreement, the court finds that plaintiffs are precluded from asserting their Count I claims. Defendant is accordingly entitled to summary judgment on Count I. The court will explain these findings in turn but will consider plaintiffs' motion for discovery further below, in Part III.C.

## 1. The Court Finds That Plaintiffs Are Members of the *Cobell* Trust Administration Class

The court begins by noting that the Settlement Agreement defines "Trust Administration Class" in very broad terms, as including beneficiaries "alive as of the Record Date" who have a "demonstrable ownership interest in land held in trust or restricted status." *See* definition of "Trust Administration Class," *Cobell* Settlement Agreement at A.35 [Def.'s Ex. 4 at 66]. The court finds that the allegations made by plaintiffs themselves in their complaint, which are consistent with the Herman and Wolf Declarations submitted by defendant, show that plaintiffs are members of the Trust Administration Class, as defined under these terms.

As explained above in Part I.A, plaintiffs allege that Ms. Two Shields is an "owner and heir to Allotment 651A" and that both Ms. Two Shields and Ms. Wilson are "owners and heirs to Allotment M 868A." Compl. ¶¶ 103-04; *see also* Compl. ¶¶ 16-17, 137-38. The Herman and Wolf Declarations likewise state that plaintiffs have interests in these particular allotments. *See* Herman Decl. at ¶ 10, 12-13 [App. Ex. 1 at 3]; Wolf Decl. at ¶¶ 3-9 [App. Ex. 2 at 21]. It is uncontroverted that these allotments are held in trust by the BIA—both the government and plaintiffs allege that the BIA approved the lease of these allotments to Zenergy and the assignment of these leases to Dakota-3. *See* Compl. ¶¶ 16-17, 103-04, 137-38; *c.f.* Wolf Decl. at ¶ 5-9. Based on this information, the court finds that plaintiffs Two Shields and Wilson had a "demonstrable ownership interest in land held in trust" before or at the time of the Record Date, and are accordingly members of the Trust Administration Class.

- 16 -

**2. The Court Finds That the Claims Advanced by Plaintiffs in Count I Are "Land Administration Claims"**

To begin with, Plaintiffs observe that "land administration claims" only include "known and unknown claims that have been or *could have been asserted* through the Record Date" of September 30, 2009.  *Cobell* Settlement at ¶ A.21 [App. Ex. 4 at 63-64] (emphasis added).  Plaintiffs argue that they could not have asserted their breach of fiduciary duty claims before September 30, 2009, and that, consequently, their claims are not "land administration claims" as defined by the Settlement Agreement.

Plaintiffs support this argument by applying principles of equitable tolling—according to plaintiffs, "it is commonly understood that a claim can be asserted only when complete in 'nature, scope, *and implications*.'"  Pl.'s Opp'n at 13 (quoting *Lutrell v. Cooper Indus., Inc*., 60 F. Supp. 2d 629, 632 E.D. Ky. 1998) (emphasis added by plaintiffs).  Plaintiffs also quote *Catawa Indian Tribe v. United States*, which states that "a claim does not accrue until all events necessary to fix the liability of the defendant have occurred," *i.e.*, "when 'the plaintiff has a legal right to maintain his or her action.'"  Pl.'s Opp'n at 13 (quoting *Catawba Indian Tribe*, 982 F.2d 1564, 1570 (Fed. Cir. 1993)).  Plaintiffs also cite *Young v. United States* for the proposition that the statute of limitations only begins to run when a plaintiff learns or could have learned "all of the relevant facts." *Id*. (*citing* 529 F.3d 1380, 1386 (Fed. Cir. 2008)).

Although the BIA originally leased plaintiffs' mineral interests to Dakota-3 between 2007 and 2008—*i.e.*, *before* the September 30, 2009 Record Date—plaintiffs argue that their Count I claims never "accrued" before the Record Date because they were not aware of the full extent of the harm caused by the government's actions until Dakota-3 re-assigned the leases to Williams at a bonus price of $10,000 per acre, an event that occurred about 14 months *after* the Record Date had passed.  "Only then . . . did the complete implications of the Government's breaches come to light."  Pl.'s Opp'n at 14.  It was only at that point that "the final piece of the puzzle came into existence.  *Id*.  Plaintiffs, accordingly, conclude that none of the Count I breach of fiduciary duty claims "could have been asserted through the Record Date," and therefore are not land administration claims.  Pl.'s Opp'n at 13-14.  According to plaintiffs, "a reasonably intelligent observer . . . could . . . conclude that the *Cobell* Agreement did not include Plaintiffs' unperfected *Two Shields* claims."  *Id*. at 14.

The court finds that the equitable tolling cases cited by plaintiffs simply have no bearing on the question of whether plaintiffs "could have" asserted their claims, for purposes of the Release Clause.  The issue raised by the *Cobell* Settlement's definition of "land administration claims" is simply whether plaintiffs *could have* asserted their claims before the Record Date.  In contrast, in statute of limitations cases, the issue is whether plaintiffs were *required* to assert a claim by a certain date to avoid running afoul of the statute of limitations.  As the appellate division of the Court of Claims (the predecessor of the Federal Circuit) has explained, the two matters are distinct:

> Plaintiff gets no help from the rule that a claim does not accrue for the purpose of the beginning of a period of limitations until the damages are ascertainable. . . . The issue here is not a matter of when a claim for damages not yet fully ascertained is barred by the passage of time, but whether a claimant 'had' or possessed a claim, sufficiently to reserve it from a general release, at a time when all the damages had not yet been ascertained. The rule for releases is that absent

special viating circumstances, a general release bars claims based upon events
occurring prior to the date of the release.

*Johnson, Drake & Piper, Inc. v. United States*, 531 F.2d 1037, 1047 (Ct. Cl. 1976). *See also
Raytheon Co. v. United States*, 96 Fed. Cl. 548, 553 (2011) (holding that plaintiffs are generally
"barred from seeking compensation for claims based on events that occurred before the
execution of a release"); *Info. Sys. & Networks Corp. v. United States*, 68 Fed. Cl. 336, 342-43
(2005).

Additionally, plaintiffs' application of the rules for equitable tolling does not make sense
in the context of settlement release clauses.  Plaintiffs' approach, which posits that no claim
accrues until a plaintiff has learned "all of the relevant facts" regarding damages, would make
any general release—and hence many settlements—impracticable, as the extent of the damage
caused by a defendant's alleged wrongdoing frequently does not become apparent until years
after the Record Date has passed.  In fact, one of the principal purposes of settling is to reduce
uncertainty and give plaintiffs a monetary payout without waiting to find out the exact nature and
extent of the damages.  *See, e.g., S & T Mfg. Co., Inc. v. Hillsborough Cnty., Fla*., 815 F.2d 676,
678 (Fed. Cir. 1987).  In any settlement, both parties bear a certain amount of risk—the plaintiff
bears the risk that the settlement will provide less than what plaintiff would have been awarded
by a jury at trial, while the defendant bears the risk of paying more than plaintiff would have
been able to win at trial, once more information has become available.

The court also finds that plaintiffs' interpretation of "land administration claims"
conflicts with the plain language of the Settlement Agreement.  The Settlement Agreement
provides that "land administration claims" cover all "known *and unknown* claims that could have
been asserted . . . ."  *Cobell* Settlement at ¶ A.21 [App. Ex. 4 at 63-64] (emphasis added).  The
fact that the definition includes "unknown" claims clearly indicates that a party can have a land
administration claim against the government, regardless of whether it is fully aware of the extent
of the harm caused by the government's actions.

In short, the court finds that the definition of "land administration claims" is quite clear—
plaintiffs had land administration claims as long as they "'had' or possessed a claim, sufficiently
to reserve it from a general release," before the Record Date, regardless of whether they were
fully aware of the full extent of the damages.  *Johnson, Drake & Piper*, 531 F.2d at 1047.

The court finds that plaintiffs possessed such claims.  First and foremost, the actions on
the part of the government that occasioned the alleged breach of fiduciary duty occurred *prior to*
the Record Date.  The leases that the BIA purportedly "rubber stamped" were executed and
approved by the BIA on December 19, 2007 and on February 24, 2008.  Hence, the court finds
that plaintiffs possessed claims prior to the Record Date.

Secondly, the court notes that plaintiffs had considerable notice of the breach prior to the
Record Date, even if they were not aware of the full extent of the consequences.  As plaintiffs
point out, other Fort Berthold Reservation allotments had already been reassigned well before the
Record Date.  *See* Compl. ¶¶ 83-89 (noting that in late 2006, Black Rock Resources assigned
leases, which it had acquired several years earlier for $35 per acre, to Marathon Oil for a lease
bonus of $400 per acre).  In response to these reassignments, Jerry Nagel, a tribal Program
Analyst, sent letters to numerous officials in December 2006 "regarding the conspiracy he
believed to be afoot."  Compl. ¶¶ 84, 89.  On March 26, 2008, the Elders Organization "sent

letters to The Office of Services and Trust for American Indians and again to the Attorney General" expressing "outrage" over the leasing on the Fort Berthold Reservation. Compl. ¶ 92. Although plaintiffs argue that tribal officials were in cahoots with the Dakota-3 and hence ignored Nagel's warning, plaintiff Two Shields was serving as Secretary/Treasury of the Elders Organization and thus had actual notice of the government's breach prior to the Record Date. *See* Compl. ¶¶ 95, 137(b); Def.'s Reply at 12.

For the foregoing reasons, the court finds that plaintiffs possessed claims that they "could have" asserted prior to the Record Date.  The court also finds that in all other respects, plaintiffs' breach of fiduciary duty claims are "land management claims" as defined under the terms of the *Cobell* Settlement.  Plaintiffs' Count I claims are consistent with the examples of mismanagement provided by the definition, including "[f]ailure to obtain fair market value for leases," and the "[f]ailure to prudently negotiate leases."  *Cobell* Settlement at ¶ A.21 [Def.'s Ex. 4, ECF No. 6-2, at 63-63].

### 3. The Court's Finding That the Cobell Settlement Agreement Encompasses Count I Is Consistent with Other Parts of the Cobell Settlement Agreement

#### a. Plaintiffs' Payment Mechanics Argument

Plaintiffs argue that the "mechanics of the release agreement" support their view that the Settlement Agreement could not possibly encompass their Count I claims.  Pl.'s Opp'n at 16.  As plaintiffs explain, the Settlement Agreement:

> provides two payments for Trust Administration Claims.  First, it gives every class member an $800 base payment. . . . Second, it gives each an additional pro rata payment based on the amount of money that flowed through his or her IIM account from October 1, 1985 through September 30, 2009. . . . The more money that flowed into the account during that period, the more the individual will receive.

*Id*.  According to plaintiffs, this payment mechanism "makes no sense as applied to Plaintiffs' claims" because under this formula, "*Two Shields* class members with lower lease bonuses and royalty rates (and thus higher damages) will receive less than *Two Shields* class members with higher lease bonuses and royalty rates (and thus lower damages) because less money flowed through those class members' IIM accounts."  *Id*.

But this very argument was raised before the D.C. Circuit by one of the *Cobell* objectors, as defendant points out:

> A class member whose account was administered appropriately will, *ceteris paribus* [all else being equal], have more revenue than a class member whose account was improperly administered.  Yet under the settlement, the first class member, who has suffered no injury, will receive more money than the class member who suffered injury.

Opening Brief of Appellant Kimberly Craven at 24 in *Cobell v. Salazar*, D.C. Cir. No. 11-5205, attached as Ex. 1, ECF No. 14-1.  The D.C. Circuit rejected this argument, for the following reasons:

> Although Craven has standing to challenge the fairness of the distribution scheme on the basis of the alleged intraclass conflict, her contention fails on the merits. As an initial matter, Craven's discussion of a hypothetical conflict is an inadequate basis for vacating the class settlement agreement. . . . Even assuming those claims survived, that class member, like any other class member who is allegedly under-compensated by the distribution formula, could have opted out of the Trust Administration Class; the record indicates the class member at issue declined to do so.  Indeed, the existence of the opt-out alternative effectively negates any inference that those who did not exercise that option considered the settlement unfair.

*Cobell v. Salazar*, 679 F.3d at 920 (D.C. Cir. 2012) cert. denied, 133 S. Ct. 543 (2012).

This court has already found that plaintiffs were part of the *Cobell* Trust Administration Class.  *See supra*, Part III.B.1.  Plaintiffs undisputedly failed to opt out of the Settlement Agreement.  Accordingly, plaintiffs are bound by the D.C. Circuit's judgment on the matter: "There is of course no dispute that under elementary principles of prior adjudication a judgment in a properly entertained class action is binding on class members in any subsequent litigation." *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984).  *See also Smith v. Bayer Corp*., 131 S. Ct. 2368, 2380 (discussing the principle that "unnamed members of a class action [may] be bound, even though they are not parties to the suit").  The court rejects plaintiffs' payment mechanics argument as an impermissible collateral attack on the D.C. Circuit's final judgment.

### b. Plaintiffs' Standing Argument

As explained above, the *Cobell* Settlement Agreement only discharges the government of liability for those "claims . . . that were, or should have been, asserted in the Amended Complaint . . . ." Settlement Agreement, ¶ I.2 [App. Ex. 4 at 96].  Plaintiffs argue that the *Cobell* Settlement "did not and could not include Plaintiffs' *Two Shields* claims" because the named *Cobell* plaintiffs purportedly would have lacked standing to assert the *Two Shields* claims.  Pl.'s Opp'n at 26.  Plaintiffs assert that "[t]he named *Cobell* plaintiffs had no connection whatsoever to the Fort Berthold Reservation," and that the amended *Cobell* complaint does "not contain even a whisper of the *Two Shields* claims."  *Id*. at 25.  Plaintiffs note that the general leasing statute that encompasses the Two Shields claims—*i.e*., 25 U.S.C. § 396—was never mentioned in the Amended Complaint.  Pl.'s Opp'n at 26.  According to plaintiffs, "the *only* conclusion that can clearly be drawn at this point from the plain language of the *Cobell* Agreement is that it did not and could not include Plaintiffs' *Two Shields* claims."  *Id*. at 26 (original emphasis).

The court disagrees.  As defendant points out, the *Cobell* class representatives undisputedly had standing to assert their own claims and, for Article III purposes, unnamed plaintiffs "need not make any individual showing of standing."  Def.'s Reply at 12 (quoting *Lewis v. Casey*, 518 U.S. 343, 395-96 (1996) (Souter, J., concurring-in-part and dissenting-in-part).

Moreover, the fact that the Amended Complaint—which was filed on behalf of more than 300,000 unnamed plaintiffs—fails to mention the particular general leasing statute that applies to Ms. Two Shields' and Ms. Wilson's claims is not dispositive.  As defendant points out, Carol Good Bear, one of the *Cobell* class action plaintiffs who challenged the fairness of both the *Cobell* class certification and the terms of the *Cobell* Settlement Agreement—made a similar argument: "There is no plaintiff from the most active and largest oilfield in the nation. The money in the Fort Berthold accounts, or that should be in the Fort Berthold accounts, has very little in common with what should be in a very small account, for example, in Nebraska and Montana, Oklahoma or Wisconsin."  *Cobell* Fairness Hearing Tr. at 48:15-20 [attached as Ex. 1, ECF No. 17-1, at 13].  But the district court, as well as the D.C. Circuit, rejected this line of reasoning:

> Under Rule 23(a), commonality requires that plaintiffs advance a "common contention" that "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." [*Wal–Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011).]   The Trust Administration Class satisfies this requirement. Although Craven characterizes the Class as "sprawling" and encompassing "dozens of wildly different theories of liability," Appellant's Br. at 42, all of the class members' trust claims revolve around resolution of a single issue—the extent of the Secretary's fiduciary obligation as trustee of the IIM accounts.

*Cobell*, 679 F.3d at 922.

The court finds that plaintiffs' standing argument lacks merit and amounts to an impermissible collateral attack on the D.C. Circuit's judgment affirming the certification of the *Cobell* class.  The court accordingly rejects this argument as well.

\* \* \* \* \*

For the foregoing reasons, the court finds that plaintiffs are members of the Trust Administration Class whose land administration claims are encompassed by the *Cobell* Settlement Agreement.  Plaintiffs failed to opt out of the Settlement Agreement, and are thus precluded from pursuing their Count I claims in this court.  The court accordingly grants defendant's motion for summary judgment as to Count I.  The court now proceeds to consider plaintiffs' motion for discovery.

## C. The Court Denies Plaintiffs' Motion for Discovery

Plaintiffs characterize defendant's motion for summary judgment as a "starkly improper" attempt to "railroad Plaintiffs into responding to the Government's fact-based argument without the benefit of *any* discovery."  Pl.'s Opp'n at 18-19.  Plaintiffs point out that trial courts are reluctant to consider summary judgment arguments if "the motion comes quickly after the complaint was filed [or] discovery is in its infancy and the nonmovant is limited in obtaining and submitting evidence to counter the motion."  *Id.*  (quoting *Easter v. United States*, 575 F.3d 1322, 1336 (Fed. Cir. 2009) and *Jade Trading, LLC v. United States*, 60 Fed. Cl. 558, 565 (2004) (holding that requests for additional discovery pursuant to RCFC 56(d) are generally "favored" and "liberally granted.")).  Plaintiffs accordingly move for discovery, both in their opposition

brief and in a separate motion.  *See* Pl.'s Opp'n Mot. Dismiss, at 18-22; *see also* Pl.'s Mot. Discovery, ECF No. 12.

The court begins by noting that even if motions for discovery are treated liberally at this early stage in the litigation, such motions are not automatically granted.  To be entitled to discovery, "a party must state with precision the material he hopes to obtain with further discovery and how that material will allow the party to oppose summary judgment and rebut any showing of the absence of a genuine issue of fact." *Chevron U.S.A. Inc. v. United States*, 72 Fed. Cl. 817, 819 (2006).  The courts, accordingly, deny discovery requests that are futile or are unlikely to elicit evidence that would be relevant in establishing a genuine issue of material fact. *See*, *e.g.*, *T & M Distributors, Inc. v. United States*, 185 F.3d 1279, 1285 (Fed. Cir. 1999); *Theisen Vending Co., Inc. v. United States*, 58 Fed. Cl. 194, 198 (2003).

Defendant, in fact, opposes plaintiffs' discovery request on this very ground.  Defendant argues that the release clause unambiguously applies to plaintiffs' land management claims, and contends that any discovery would be futile because the rules of contract interpretation prohibit consideration of extrinsic evidence if the disputed language is clear and unambiguous.  Def.'s Reply, ECF No. 14, at 15-18.  Defendant, in short, argues that the court should deny plaintiffs' discovery motion on the ground that it is unlikely to elicit information likely to create any genuine issue of material fact.

Plaintiffs disagree, and argue that Federal Circuit precedent permits this court to consider extrinsic evidence in order to ascertain whether a contract provision is clear or ambiguous in the first place.  *See* Pl.'s Opp'n at 9-10 (citing *Imprimis Investors LLC v. United States*, 83 Fed. Cl. 46, 61 (2008) and *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin*., 169 F.3d 747, 752 (Fed. Cir. 1999)).  The court now proceeds to consider plaintiffs' argument regarding extrinsic evidence, followed by plaintiffs' motion for discovery.

## 1. Plaintiffs' Invitation To Use Extrinsic Evidence in Construing the Release Clause

The dispute here, regarding whether the court is permitted to consult extrinsic evidence in construing the Release Clause, a specie of contract, [24] is governed by the rules of contract interpretation. These rules, as defined by the Federal Circuit, require the trial court to begin its analysis of the disputed contract provision by examining the plain language of the agreement. *See, e.g., Bell/Heery v. United States*, 739 F.3d 1324, 1331 (Fed. Cir. 2014) ("Contract interpretation begins with the language of the written statement") (quotations omitted); *LAI Servs., Inc. v. Gates*, 573 F.3d 1306, 1314 (Fed. Cir. 2009); *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004).  Federal Circuit precedent generally precludes the trial court from considering extrinsic evidence if the language of the provision in question is "clear and unambiguous." *Bell/Heery*, 739 F.3d at 1331 ("When interpreting a contract, if the provisions are clear and unambiguous, they must be given their plain and ordinary meaning") (internal quotations omitted); *see also Shell Oil Co. v. United States*, 751 F.3d 1282, 1295 (Fed. Cir. 2014) ("The Government has not established ambiguity in the relevant provision, in the absence of which it is improper to rely on extrinsic evidence.").

---

[24] In *VanDesande v. United States*, the Federal Circuit held that settlement agreements "should be viewed for enforcement purposes as having the attributes of a contract," "even if they are incorporated into judicial or administrative consent decrees."  673 F.3d 1342, 1350 (Fed. Cir. 2012).  Accordingly, the rules of contract interpretation apply.

Notwithstanding these precedents, plaintiffs argue that the court cannot conclude that the language of a release is unambiguous unless it considers "the entirety of the instrument of the release and the facts and circumstances attending its execution."  Pl.'s Opp'n at 9-10 (citing *Imprimis*, 83 Fed. Cl. 46 at 61).  Plaintiffs assert that "[t]he surrounding facts and circumstances provided context for the terms of the release, and 'context may well reveal that' contract terms otherwise thought to be clear 'are not, and never were, clear on their face.'"  Pl.'s Opp'n at 10 (quoting *Metric Constructors*, 169 F.3d 747 at 752).

The court finds that plaintiffs quote *Imprimis* out of context.  The phrase quoted (courts consider the "facts and circumstances attending [the contract's] execution") only applies when a contract is ambiguous in the first place.  In the very same paragraph, the court states that "extrinsic evidence will be allowed to interpret an *ambiguous* clause."  *Imprimis*, 83 Fed. Cl. at 61 (emphasis added).  Consistent with Federal Circuit precedent, the court in *Imprimis* states that it may consider extrinsic evidence only "if a contract is found to be uncertain or unambiguous," and not if the contract is "clear on its face."  *Id*. at 55, 61.

The court also finds plaintiffs' reliance on *Metric Constructors* unavailing.  At issue in *Metric Constructors* was whether a provision requiring that "[n]ew lamps . . . be installed immediately prior to completion of the project" called for the replacement of all lamps or only the replacement of broken, defective, or burned out lamps.  *Metric Constructors*, 169 F.3d at 749.  Although the contract specifications on their face called for "new lamps," Metric pointed out that the term "relamping" is usually used when the replacement of all lamps is called for.  *Id*. Moreover, as the Armed Services Board of Contract Appeals had noted in a prior opinion, it is uncommon for specifications for new construction to require relamping.  *Id*.  Metric argued that its reliance on trade custom was reasonable in light of NASA's conduct.  In particular, NASA's cost estimates did not include relamping the facility.  *Id*. at 750.  The Federal Circuit ultimately held that when a disagreement over the meaning of a contract provision is raised on the basis of trade practice and custom, extrinsic evidence can be considered even if the plain language of the provision is unambiguous.  *Id*. at 752.

Nonetheless, the Federal Circuit expressly limited the application of this approach to the context of "trade custom and interpretation."  *Id*. at 751 ("This case squarely presents the recurring issue of the role of evidence of trade practice and custom in contract interpretation").  The Federal Circuit cautioned that extrinsic evidence cannot be used "to create an ambiguity where a contract was not reasonably susceptible of different interpretations at the time of contracting."  *Id*. at 752.  The Federal Circuit contemplated the consideration of trade custom or practice "only where a party makes a showing that it relied reasonably on a competing interpretation of the words when it entered into the contract."  *Id*.

The court finds that *Metric Constructors* is not applicable to the instant case.  Plaintiffs do not allege reasonable reliance on a trade custom or that a misunderstanding exists due to confusion over some undefined term of art.  The Settlement Agreement includes a lengthy section defining various phrases used in the Settlement, such as "Record Date," "Trust Administration Class," "Land Administration Claims," etc.  Plaintiffs do not allege that any of these terms is poorly defined, but speculate that discovery will reveal evidence that indicates that the Settlement Agreement does not apply to Count I.  The court finds plaintiffs' broad construction of *Metric Constructors* especially inappropriate in light of the various statements made by the Federal Circuit in that case emphasizing the narrow nature of the opinion.

Plaintiffs' disregard for Federal Circuit precedent is truly striking.  Plaintiffs not only misapply *Imprimis* and *Metric Constructors*, but go so far as to argue that the court should ignore the plain language of the Settlement Agreement—plaintiffs argue that their Count I claims "could not have been asserted in the Amended Complaint . . . *regardless of whether they otherwise satisfied the definitional requirements of Land Administration Claims*."  Pl.'s Reply Supporting Mot. Discovery, ECF No. 16, at 14 (emphasis added).  The court declines to adopt this radical approach.

## 2. The Court Denies Plaintiffs' Discovery Request As Futile

Plaintiffs have supplied the court with a detailed and wide-ranging list of information they seek to discover, including (1) "information related to the Government's awareness or knowledge prior to September 30, 2009, and December 10, 2010" of the *Two Shields* claims, (2) "information related to the *Cobell* payment methodology and any payments to be made to *Two Shields* class members under the *Cobell* settlement," (3) "information in the Government's possession related to the value of the *Two Shields* mineral interests," (4) information related to "the 'negotiation and execution' of the *Cobell* Settlement Agreement," and (5) "information related to the Government's document retention policies."  *See* Pl.'s Ex. 1, ECF No. 11-1, at 3-5, ¶¶ 11-18; *see also* Pl.'s Opp'n to Mot. Dismiss, ECF No. 11, at 20-21; Pl.'s Mot. Discovery, ECF No. 12.

The court finds that none of this information is likely to raise any genuine issue of material fact.  As explained above, this court has already found that plaintiffs are members of the Trust Administration Class and that plaintiffs failed to opt out of the *Cobell* Settlement Agreement.  The court also found that the disputed portions of the Settlement Agreement are unambiguous and that the court is barred from considering extrinsic evidence about the circumstances in which the Agreement was formed or regarding the parties' intentions.  Therefore, any information regarding the negotiation or execution of the Settlement Agreement is irrelevant because the court would not be permitted to consider it.

Moreover, any information regarding the government's knowledge of the Two Shields claims at the time the Settlement Agreement was executed, or about the *Cobell* payment methodology, is irrelevant in light of the fact that plaintiffs' are precluded by the Settlement Agreement from pursuing any further land administration claims against the government.  In the court's view, plaintiffs' speculation that their claims could not possibly have been intended to fit the broad definition of "land administration claims," and their demand for wide-ranging discovery in search of evidence to prove this theory, is nothing more than an attempt to end-run the D.C. Circuit's judgment on the matter.

Finally, to the extent that plaintiffs seek to elicit information showing that defendant breached a fiduciary duty to disclose to the *Two Shields* class plaintiffs that their claims would be subsumed by the Settlement Agreemenrt, the court finds this information irrelevant in light of the court's holding, discussed below, that this court lacks jurisdiction to consider such a claim.  *See* discussion regarding Count II, *infra* Part III.D.

For the foregoing reasons, the court denies plaintiffs' motion for discovery.

**D. The Court Lacks Subject Matter Jurisdiction over Count II**

Plaintiffs argue, in Count II, that should defendant prevail in arguing that the *Cobell* Settlement releases it from the breach of fiduciary claims alleged in Count I, "such [a] strategy . . . gives rise to a second, independent breach of fiduciary claim." Compl. ¶ 161. "Because the United States acts as fiduciary to the Plaintiffs and Class Members, it had an absolute fiduciary duty to fully disclose to the *Cobell* class the potential liability associated with the BIA's oil and gas approval activity for allottees on the Fort Berthold Reservation, if it wished to resolve them in the *Cobell* litigation." Compl. ¶ 175. Plaintiffs allege that the United States failed to make such a disclosure to the *Cobell* class members or class counsel. Compl. ¶ 176. Plaintiffs argue that "[a]s a direct, foreseeable, and proximate result of these breaches of duties of loyalty and care," they have suffered "damages . . . in an amount that is currently unknown but which shall be proved at trial." Compl. ¶ 178.

Defendant moves to dismiss Count II for lack of subject matter jurisdiction. Def.'s Mot. Dismiss at 18-21. Defendant notes that to establish jurisdiction under the Tucker Act or Indian Tucker Act over a breach of fiduciary duty claim, plaintiffs must establish that some federal source of law creates such a duty in the first place. Defendant argues that plaintiffs have failed to make this requisite showing. Defendant also argues that Count II amounts to an impermissible collateral attack on the D.C. Circuit's judgment that the Settlement Agreement was fair, and should be accordingly dismissed for failure to state a claim.

As discussed above in Part II, Native American plaintiffs asserting a breach of fiduciary claim under the Tucker Act or Indian Tucker Act must clear "two hurdles" in order to establish jurisdiction. First, plaintiffs must identify a substantive source of law that establishes a specific fiduciary duty, and allege that the government violated that very duty. *Navajo II*, 556 U.S. at 290. This requirement cannot be met by relying on common law trust principles. *Id.* at 302. Second, if the initial threshold requirement is satisfied, plaintiffs must show that "the relevant source of substantive law can be fairly interpreted as mandating compensation for damages sustained as a result of a breach of the duties" imposed by the governing law. *Id.* at 291.

As for the initial, threshold hurdle, plaintiffs rely on the Indian Long-Term Leasing Act, 25 U.S.C. § 396. As explained above, this general leasing statute does create an enforceable fiduciary duty to maximize the economic value of plaintiffs' allotments. *See* 25 U.S.C. § 396 (placing allotted Indian lands under the control of the Secretary of the Interior) (discussed *supra*); 25 C.F.R. § 212.1(a); *see also White Mountain*, 249 F.3d at 1375 (holding that § 396 creates an enforceable fiduciary duty to prudently manage allotted oil interests). Nevertheless, as plaintiffs concede, § 396 "says nothing about any disclosure obligations of the United States." Pl.'s Opp'n at 33.

The court finds that this flaw is fatal to Count II because the breach alleged in Count II is a failure to disclose, not a failure to prudently manage plaintiffs' oil interests. Stated otherwise, the Indian Long-Term Leasing Act only applies to plaintiffs' Count I land management claims, not to plaintiffs' Count II failure to disclose claims. In light of the absence of any statutory reference in § 396 to any fiduciary duty to disclose, the court finds that plaintiffs fail to satisfy the threshold requirement described in *Navajo II*.

Plaintiffs contend that such a finding "relies entirely on the false premise that the Government can be sued by its Native American wards only for duties specifically spelled out by

government," and argue that it is permissible for them to rely on common law trust principles. *See* Pl.'s Opp'n at 26-27 (quoting *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) ("*White Mountain II*"); *Jicarilla Apache Nation v. United States*, 100 Fed. Cl. 726, 738 (2011)). But plaintiffs misstate the law. As explained above, the court is not allowed to apply common law trust principles unless plaintiffs succeed in satisfying the first, threshold hurdle. Merely establishing the existence of a trust relationship between the government and plaintiffs "is insufficient to support jurisdiction under the Indian Tucker Act. Instead, the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Navajo I*, 537 U.S. at 506.

Additionally, the court finds that plaintiffs misapply both *White Mountain II* and *Jicarilla Apache Nation* by quoting language that applies only to the second hurdle, which is inapplicable here due to plaintiffs' failure to meet the first hurdle.

In *White Mountain II*, the plaintiffs alleged that the United States breached its fiduciary duty to "maintain, protect, repair, and preserve" property held in trust for the tribe but occupied by the United States. The *White Mountain II* plaintiffs met the first hurdle by identifying a substantive source of law that establishes the same fiduciary duty that they claim the government breached—specifically, plaintiffs pointed out that Pub. L. 86-392, 74 Stat. 8 (1960) provides that the "former Fort Apache Military Reservation" be "held by the United States in trust for the White Mountain Apache Tribe . . . ." *White Mountain II*, 537 U.S. at 480. Finding that plaintiffs had successfully identified a substantive law establishing the alleged fiduciary duty, the *White Mountain II* Court held that plaintiffs met the second "fair interpretation" requirement, despite the fact that the statute did not specifically provide for money damages. But as explained above, the Two Shields plaintiffs failed to meet the initial hurdle, therefore the "fair interpretation rule" never comes into play.

Plaintiffs' reliance on *Jicarilla Apache Nation* is similarly misplaced. The plaintiffs in *Jicarilla* argued that the Government had breached its fiduciary duties by "failing to pool the Apache Nation's trust funds with those of other tribes for investment purposes" and by "immediately removing funds from the trust fund to cover disbursement checks, thereby creating a lag between the removal of funds and check negotiation, during which time no income was earned on the subject funds." *Jicarilla*, 100 Fed. Cl. at 729. As in *White Mountain II*, the plaintiffs in *Jicarilla* were able to identify a statutory provision that created a fiduciary duty for the particular alleged duty. Specifically, the *Jicarilla* plaintiffs relied on 25 U.S.C. §§ 161, 161a, 162a, and 4001 *et seq.*, which "expressly refer to the United States as 'trustee of the various tribes' . . . and to the accounts at issue as 'tribal trust funds.'" *Id.* at 731. Accordingly, the court found it permissible to apply common law trust principles to determine whether the statute could be fairly interpreted as mandating compensation for the alleged breach of fiduciary duty, despite the absence of explicit language to that effect. *Id.* at 731-32. But in contrast to the *Jicarilla* plaintiffs, the *Two Shields* plaintiffs failed to satisfy the initial threshold requirement. Thus trust principles do not come into play.

In conclusion, plaintiffs have failed to "identify a separate source of substantive law that creates the right to money damages" for the breach of the alleged fiduciary duty of disclosure, as required by the Tucker Act. *See Fisher*, 402 F.3d at 1172. The court therefore finds that it lacks subject matter jurisdiction over Count II, and grants defendant's motion to dismiss Count II. Since the court lacks subject matter jurisdiction over Count II, the court finds no need to consider the non-jurisdictional arguments raised by defendant in its motion to dismiss.

**E. The Court Dismisses Count III for Failure To State a Claim**

Plaintiffs assert, in Count III, that the claims advanced in Count I and II are vested private property interests within the meaning of the Fifth Amendment.  Compl. ¶ 183.  Plaintiffs argue that but for the Claims Resolution Act of 2010,[25] the *Cobell* Settlement would not have precluded them from advancing their Count I and II breach of fiduciary duty claims.  Compl. ¶¶ 185-89; Pl.'s Opp'n Def.'s Mot. Dismiss, ECF No. 11, at 40.  Plaintiffs, accordingly, argue that to the extent that the *Cobell* settlement extinguished plaintiffs' breach of fiduciary duty claims, those claims have been taken by defendant without just compensation, in violation of the Fifth Amendment's Takings Clause.[26]  Compl. ¶¶ 181-93.

The Fifth Amendment prohibits the government from taking private property for public use unless it provides just compensation.  *See* U.S. Const. amend. V, cl. 4 ("[N]or shall private property be taken for public use, without just compensation.").  It is uncontroverted that the Tucker Act confers upon this court jurisdiction to hear takings claims, as the reference in the Takings Clause to "just compensation" is an explicit money-mandating provision.  *See, e.g.*, *Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008).

The Federal Circuit applies a two-part test to determine whether a government act constitutes a taking under the Fifth Amendment.  The first, threshold inquiry, is to determine whether a plaintiff's asserted interest is a cognizable property right under the Fifth Amendment. *See, e.g.*, *Boise Cascade Corporation v. United States*, 296 F.3d 1339, 1343 (Fed. Cir. 2002). The determination of whether the rights or interest claimed by plaintiffs qualifies turns on "existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law, [that] define the dimensions of the requisite property interests for purposes of establishing a cognizable taking."  *Air Pegasus of D.C. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2009).  Second, the court must determine whether any taking of that property right has actually occurred.  *See Boise Cascade Corporation*, 296 F.3d at 1343.

As for the initial threshold inquiry, plaintiffs assert that Counts I and II are, *ipso facto*, "a valid, vested property interest."  Pl.'s Opp'n Def.'s Mot. Dismiss, ECF No. 11, at 36.  In so arguing, plaintiffs rely on language from *Alliance of Descendants v.United States*, which states that "a legal cause of action is property within the meaning of the Fifth Amendment."  Pl.'s

---

[25] As explained above in Part I.B, the Claims Resolution Act retroactively conferred jurisdiction on the Federal District Court for the District of Columbia "for purposes of the Settlement," "[n]otwithstanding the limitation on the jurisdiction of the limitation on the jurisdiction of the district courts of the United States in [28 U.S.C. § 1346(a)(2)]."  Pub. L. No. 111-291, § 191, 124 Stat. 3064, 3066-67.  The Act also permitted certification of the Trust Administration Class "[n]otwithstanding the requirements of the Federal Rules of Civil Procedure."  *Id.*

[26] Plaintiffs also contend that the Claims Resolution Act's retroactive remedy was ineffective, because the wording of the Act only granted the district court jurisdiction "for purposes of the Settlement."  According to plaintiffs, the Act failed to give the court jurisdiction to try the suit in the first place.  See Compl. ¶ 165; Pl.'s Opp'n at 41 n.22.  The court rejects this argument, as it has already been considered and rejected by the D.C. Circuit.  *Good Bear v. Salazar*, Nos 11-5270, et al., 2012 WL 1884702 at *1 (D.C. Cir. May 22, 2012).

Opp'n Def.'s Mot. Dismiss, ECF No. 11, at 36 (quoting *Alliance*, 37 F.3d 1478, 1481 (Fed. Cir. 1994)). But this broad construction of *Alliance* conflicts with Federal Circuit precedent: a claim can only be a property right under the Fifth Amendment if it "protects a legally-recognized property interest." *Adams v. United States*, 391 F.3d 1212, 1225-26 (Fed. Cir. 2004). In Count I, plaintiffs are not seeking compensation for an actual taking of their mineral rights, but are alleging that the BIA breached a fiduciary duty by leasing plaintiffs' mineral rights on terms below market value. The court finds it unclear whether a breach of fiduciary duty claim is a cognizable property interest, and plaintiffs present no authority on the matter.

In any event, the Court of Federal Claims has held that "[f]or purposes of the Takings Clause, "no 'vested' right [in a claim] attaches until there is a final, unreviewable judgment." *Shinnecock Indian Nation v. United States*, 112 Fed. Cl. 369, 384 (2013) (quoting *Rogers v. Tristar Prods., Inc.*, Nos.2011–1494 and 2011–1495, 2012 WL 1660604, at *2 (Fed. Cir. May 2, 2012) (per curiam) (unpublished). The Ninth Circuit, similarly, has held that "a property right in a cause of action does not vest until a final unreviewable judgment is obtained" because a cause of action, in and of itself, is "inchoate" and "speculative." *Bowers v. Whitman*, 671 F.3d 905, 913-914 (9th Cir. 2012). This court agrees, and finds that due to the absence of a final judgment, plaintiffs' Count I and II claims do not amount to a cognizable property interest.

Moreover, even if the court proceeds to the second hurdle, plaintiffs cannot show that a taking ever occurred. Despite the fact that Claims Resolution Act authorized the district court to certify the Trust Administration Class without being bound by the requirements of FRCP 23, *see* Pub. L. No. 111-291, § 191, 124 Stat. 3064, 3066-67, the district court applied Rule 23 anyway, and found that the requirements of the rule had been satisfied. *See Cobell v. Salazar*, No. 1:96CV01285 TFH, 2011 WL 10676927, at *2 (D.D.C. July 27, 2011) *aff'd*, 679 F.3d 909 (D.C. Cir. 2012). As explained above, the D.C. Circuit also affirmed the district court's finding that members of the Trust Administration Class had been given fair and adequate notice of their opportunity to opt out of the Settlement Agreement. *See Cobell v. Salazar*, 679 F.3d at. 922-24. Therefore, plaintiffs' argument that the Claims Resolution Act "eviscerated" plaintiffs' procedural rights is without merit.

Finally, the court is doubtful that Count III is even a takings claim to begin with. The gravamen of Count III is that the Claims Resolution Act of 2010 deprived plaintiffs of their due process rights by eliminating the protections afforded to absent class members by Rule 23[27] of the Federal Rules of Civil Procedure ("FRCP")—according to plaintiffs, the Act "eviscerated the protections of Rule 23 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1346(a)(2) that otherwise would have precluded the named *Cobell* plaintiffs from affecting Plaintiffs' rights in their oil and gas causes of action." Pl.'s Opp'n Mot. Dismiss, ECF No. 11, at 40. Looking to the

---

[27] As explained above, Rule 23(a) permits the certification of class action suits only if the following conditions are satisfied: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

substance, Count III appears to be a due process claim masquerading as a takings claim, designed to hurdle the jurisdictional bar to hearing due process claims in this court.[28]

The court therefore grants defendant's motion to dismiss Count III.

## IV. CONCLUSION

For the foregoing reasons, plaintiffs' MOTION for discovery is DENIED.  Defendant's MOTION for judicial notice is GRANTED-IN-PART, and plaintiffs' MOTION for leave to file a sur-reply, is GRANTED.  Accordingly, the sur-reply attached to plaintiffs' motion is deemed filed into the record.  Defendant's MOTIONS for summary judgment, and to dismiss Counts I, II and III, are GRANTED.  The Clerk is hereby directed to take the necessary steps to dismiss this matter.

**IT IS SO ORDERED.**

_s/ Lawrence J. Block_

Lawrence J. Block
Judge

---

[28] In contrast to the Takings Clause, the Due Process of the Fifth Amendment is not a "money-mandating provision." *James v. Caldera*, 159 F.3d at 581.  The Tucker Act does not provide this court with jurisdiction over Fifth Amendment Due Process claims unless the alleged violation constitutes an illegal exaction, *Casa de Cambio Comdiv S.A., de C.V. v. United States*, 291 F.3d 1356, 1363 (Fed. Cir. 2002), which occurs only if the Government has "improperly exacted or retained" money from the plaintiff, *Testan*, 424 U.S. at 401, 96 S.Ct. 948.